# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN LEE SMITH, SR., and JIMMIE LEE JACKSON,<br><br>　　　　　　　　　　　　Plaintiffs,<br><br>　vs.<br><br>WARDEN G.J. GIURBINO; ASSOCIATE WARDEN S. RYAN; ASSOCIATE WARDEN J.D. STOKES; CORRECTIONAL LIEUTENANT C. GRIFFIN; CORRECTIONAL OFFICER T. RYAN; CORRECTIONAL OFFICER V. LYLES; DOES ONE TO SIX, Inclusive,<br><br>　　　　　　　　　　　　Defendants. | CASE NO. 03CV593 WQH (CAB)<br><br>**ORDER ADOPTING REPORT AND RECOMMENDATION, AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(D.E. # 64 & 78) |

HAYES, Judge:

Pending before the Court is the Report and Recommendation ("R&R") (D.E. # 78) of Magistrate Judge Cathy Ann Bencivengo, filed on July 11, 2006, recommending that Defendants' Motion for Summary Judgment (D.E. # 64) be granted in its entirety. Despite receiving extensions of time,[1] Plaintiffs failed to file an opposition to the summary judgment motion and failed to object to the R&R.

---

[1] Defendants filed their Motion on April 3, 2006. On May 22, 2006, Judge Bencivengo granted Plaintiffs' motion for extension of time to respond, giving Plaintiffs until June 12, 2006. (D.E. # 76.) On August 8, 2006, Judge Bencivengo again granted Plaintiffs' motion for extension of time, giving them until October 9, 2006. (D.E. # 87.) On December 8, 2006, Magistrate Judge Bencivengo gave Plaintiffs until January 5, 2007 to object to the R&R. (D.E. # 89.) Since July 19, 2006, neither Plaintiff has requested additional time, nor filed any other document in this case.

## I. Standard of Review

The duties of the district court in connection with a magistrate judge's report and recommendation are set forth in Rule 72 of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1). The district court must "make a *de novo* determination of those portions of the report ... to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. §636(b)(1). "[A] failure to file objections only relieves the trial court of its burden to give *de novo* review to factual findings; conclusions of law must still be reviewed *de novo*." *Barila v. Ervin*, 886 F.2d 1514, 1518 (9th Cir. 1989). Because a motion for summary judgment raises a purely legal issue, *de novo* review of the R&R in this case has not been waived by the failure to file objections. *See id.*

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When deciding a summary judgment motion, the Court "construes the evidence in the light most favorable to the nonmoving party." *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citation omitted).

## II. Background

Plaintiffs, two prisoners who were cell-mates at the Centinela State Prison ("Centinela" or "prison") from approximately March 2001 to March 2004, brought this action pursuant to 42 U.S.C. § 1983, alleging a denial of their rights to equal protection and due process under the Fourteenth Amendment. Plaintiffs claim Defendants discriminated against them on the basis of their race when, on March 18, 2002, Defendants T. Ryan ("Ryan") and V. Lyles ("Lyles") allegedly required Plaintiffs to shower together in a single-capacity shower because Plaintiffs are African-American. (Second Am. Compl. ¶¶ 14-29, 52.) Plaintiffs also claim Defendants violated their equal protection and due process rights by adopting and enforcing a policy, custom and practice of segregating inmate showers among

1 the various races at Centinela.  (*Id.* ¶¶ 6-8, 37-50, 54, 56.)

2 At the time in issue, Plaintiffs were cell-mates in the lower tier of Section C of Centinela's Building C-3.  (Jackson Dep. at 18-19, 21, 31-33; Smith Dep. at 14-16, 23-25.)  Between March 13, 2002 and approximately March 22, 2002, Building C-3 was placed under a "modified program," or "lockdown," which restricts inmate activity for security reasons, in response to an "incident."  (Jackson Dep. at 23-24, 27; Smith Dep. at 18-19.)  Building C's "Modified Program Status Report," which is issued to inmates, stated that showers were to be conducted as follows: "cell partners together - own tier."  (Jackson Dep. at 22-23, 27, 99-100, Ex. E; Smith Dep. at 59-60, Ex. 4.)  Sections A and C of building C-3 have one single-capacity shower on both the upper and lower tiers.  (Jackson Dep. at 43-44, Ex. D.)

11 On March 18, 2002, Ryan and Lyles escorted Plaintiffs from their lower-tier, Section C cell to the single-capacity shower in the lower tier of Section C.  (Jackson Dep. at 31-33; Smith Dep. at 24-25.)  Ryan told Plaintiffs they must shower together in the single-capacity shower.  (Jackson Dep. at 46, 50-51; Smith Dep. at 26-27.)  When Plaintiffs protested, Ryan told Plaintiffs they would be sent back to their cell without a shower, and she would note in the shower log that they had refused to shower.  (Jackson Dep. at 46-47, 52; Smith Dep. at 26-27.)  Plaintiffs asked if they could use one of the two double-capacity showers in Section B.  (Jackson Dep. at 57; Smith Dep. at 32.)  Ryan responded that the shower on the top tier of Section B, which she called the "Black shower," was broken, and the shower on the bottom tier of Section B was the "Hispanic shower."  (Jackson Dep. at 57-58; Smith Dep. at 33.)  She further explained that she was "just following the institutional modified program" order.  (Smith Dep. at 27-28.)

22 Plaintiffs asked Ryan and Lyles to call a supervising officer, and then Plaintiffs showered in the single-capacity shower.  (Jackson Dep. at 59; Smith Dep. at 48-49.)  While Plaintiffs showered, Ryan contacted her supervisor, who told her to "follow the modified program order."  (Jackson Dep. at 47-49; Smith Dep. at 53-54.)  Before Plaintiffs finished showering, or shortly thereafter, "Correctional Sergeant Machado" entered Building C-3 and informed Ryan and Lyles that inmates could not be ordered to shower together in single-capacity showers unless they agreed to do so.  (Jackson Dep. at 55; Smith Dep. at 53.)

This incident resulted in Plaintiffs being taunted by some of their fellow inmates. (Smith Dep. at 84-86; Jackson Dep. at 120.)

Plaintiffs instituted this action[2] in March of 2003.

### III. Discussion

"It is well-settled that a plaintiff in a section 1983 action must show: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the claimant of a right secured by the Constitution or federal law." *Hammer v. Gross*, 884 F.2d 1200, 1203 (9th Cir. 1989) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). Defendants do not challenge that they were acting under color of state law. They do, however, argue that the evidence fails as a matter of law to show any deprivation of a constitutional or federal right in this case.

"A person deprives another of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which the plaintiff complains." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Id.* (citing *Rizzo v. Goode*, 423 U.S. 362, 370-71, 375-77 (1976)).

### A. Equal Protection Claims

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985). "Prisoners are protected under the Equal Protection Clause ... from invidious discrimination based on race." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974); *see also Serrano v. Francis*, 345 F.3d 1071, 1081-82 (9th Cir. 2003). "To state a claim for violation of the Equal Protection Clause, a plaintiff must show that the defendant acted with an intent or purpose to

---

[2] Plaintiffs initially filed separate actions, Southern District of California Case Numbers 03cv593 and 03cv614. Those actions were later consolidated. (D.E. # 5.)

1 discriminate against him based upon his membership in a protected class." *Serrano*, 345 F.3d at 1082
2 (citing *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998)).

3       Plaintiffs allege that Defendants' policies regarding shower use violate the equal protection
4 clause because they are racially motivated. (Second Am. Compl. ¶¶ 37-38, 40, 43-44.) Defendants
5 respond with five declarations from prison officials stating that Centinela did not at any time have a
6 policy of racial segregation, or a policy of allowing Hispanic or Caucasian inmates to shower before
7 African-American inmates. (S. Ryan Decl. ¶¶ 4 & 6; J. Stokes Decl. ¶¶ 4 & 6; G. Giurbino Decl. ¶¶
8 3-4 & 7; Lyles Decl. ¶ 5; Ryan Decl. ¶ 5.) Defendants affidavits further indicate that the inmates
9 themselves established a system of racial classification of the showers. (S. Ryan Decl. ¶ 5; J. Stokes
10 Decl. ¶ 5; G. Giurbino Decl. ¶ 6; Lyles Decl. ¶ 6; Ryan Decl. ¶ 7.)

11       Plaintiffs' deposition testimony largely supports Defendants' evidence. Plaintiff Smith
12 ("Smith") testified that when there was no modified program, he could use any shower he wanted, just
13 as Caucasian inmates could use the upper-tier Section B showers (i.e., the "Black showers") if they
14 wanted, but they "just didn't." (Smith Dep. at 36, 48, 88-89.) Similarly, Plaintiff Jackson ("Jackson")
15 testified that outside of a modified program, inmates chose certain showers because they perceived
16 them to be identified with a certain ethnic group. (Jackson Dep. at 68-70.) Jackson further testified
17 that during a modified program, officers did not always bring Smith and himself to the Section C
18 shower, and could have brought them to the showers allegedly designated for Caucasian and Hispanic
19 inmates. (*Id*. at 62-63.) He described occasions when inmates who were being escorted to showers
20 by officers would complain, apparently for fear of retribution, because the shower was associated with
21 an ethnic group other than theirs. (*Id*. at 68-76 ("[T]here were occasions where other inmates would
22 have grievances ... with staff regarding the showers. Those were instances in which inmates were
23 being placed in showers by staff and that shower would be considered a shower for a different
24 ethnicity, and that inmate would have a grievance with the officer with respect to that.").) Once
25 during a modified program, a correctional officer placed a non-Hispanic inmate into a shower
26 identified by the inmates as "Hispanic"; the inmate yelled that the officer was "trying to place [the
27 inmate's] life in jeopardy." (*Id*. at 73-76.) When asked if this meant that Hispanic inmates "would
28 not take kindly to [the inmate] using that shower and exact revenge on him," Jackson agreed with that

1  interpretation. (*Id.* at 75-76.)

2  This evidence fails to show that Defendants maintained a racially-discriminatory shower
3  policy. During the modified program, the policy was for cell partners to shower on the same tier as
4  their cells. Inmates of different races occupied the cells of each tier. Thus, the policy was race-
5  neutral. No evidence has been designated to show that any Defendant deviated from that policy.
6  Indeed, Plaintiffs complain that Ryan and Lyles refused to deviate from that race-neutral policy by
7  taking them to a double-capacity shower on a different tier.

8  It is apparent that the basis of this suit is that Plaintiffs felt compelled by Ryan (and Lyles, who
9  watched the incident) to shower together in a single-capacity shower. (Second Am. Compl. ¶ 14
10 ("This action arises from the placing of plaitiff into a[] Single Capacity shower with another prisoner
11 on the basis of his Racial group...."). Had Ryan and Lyles permitted the Plaintiffs to shower one-at-a-
12 time in the lower-tier Section C shower (i.e., the shower of Plaintiffs' own tier)--as Sergeant Machado
13 subsequently instructed--in all likelihood, this case would not exist. But there is no evidence
14 indicating that Ryan had a racial motivation for choosing to require Plaintiffs to shower together, as
15 opposed to separately, in the lower-tier Section C shower. The only basis in the record for this
16 decision is Ryan's strict interpretation of the modified program showering directive, "cell partners
17 together - own tier."

18 Instead, the sole evidence of any prison staff member following--or even acknowledging--the
19 purported racial division of showers is Ryan's alleged statements that: (a) Plaintiffs could not use the
20 bottom-tier Section B shower because it was the "Hispanic shower," and (b) Plaintiffs could not use
21 the upper-tier Section B "Black shower" because it was broken. First, the Court will discuss whether
22 this single incident is sufficient for a reasonable jury to find that any Defendants *other than Ryan and*
23 *Lyles* violated Plaintiffs' equal protection rights.

24 **1.     Defendants Other Than Ryan and Lyles**

25 There is no *respondeat superior* liability under § 1983. *See Taylor v. List*, 880 F.2d 1040,
26 1045 (9th Cir. 1989). "Liability under section 1983 arises only upon a showing of personal
27 participation by the defendant. A supervisor is only liable for constitutional violations of his
28 subordinates if the supervisor participated in or directed the violations, or knew of the violations and

failed to act to prevent them." *Id.* (citations omitted). No Defendant other than Lyles was present when Ryan allegedly made the comments at issue. There is no evidence any Defendant other than Lyles "participated in or directed the violations, or knew of the violations and failed to act to prevent them."

Also, "[s]upervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (quotations omitted). Ryan's alleged statements on a single occasion are insufficient as a matter of law to establish that the prison had an official showering policy or custom which employed racial classifications. *See Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443-44 (9th Cir. 1989) ("Consistent with the commonly understood meaning of custom, proof of random acts or isolated events are insufficient to establish custom.") (citations omitted). Therefore, based upon the evidence submitted, no jury could reasonably find that any Defendant other than Ryan and Lyles violated Plaintiffs' equal protection rights.

### 2. Ryan and Lyles

Ryan and Lyles [3] are alleged to have directly violated Plaintiffs' constitutional rights on March 18, 2002, independent of any alleged policy of classifying showers along racial lines. (Second Am. Compl. ¶ 52.) With respect to the equal protection claims, it appears that Plaintiffs are alleging that but for Plaintiffs' race, Ryan and Lyles would have permitted Plaintiffs to shower in the double-capacity "Hispanic shower." However, "[c]ausation is, of course, a required element of a § 1983 claim." *Brooks v. United States*, 197 F.3d 1245, 1248 (9th Cir. 1999) (citation omitted); *cf. Texas v. Lesage*, 528 U.S. 18, 21 (1999) ("[T]he government's conclusive demonstration that it would have made the same decision absent the alleged discrimination precludes any finding of liability."). Even viewing the evidence in the light most favorable to Plaintiffs, Ryan and Lyles had an independent,

---

[3] For the purposes of this analysis, Lyles is treated the same as Ryan, despite the fact that Lyles is not alleged to have said anything regarding the racial classification of showers. *See Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) ("A person deprives another of a constitutional right, within the meaning of section 1983, if he does an affirmative act, *participates in another's affirmative acts*, or omits to perform an act which he is legally required to do that causes the deprivation of which the plaintiff complains.") (emphasis added). Lyles is alleged to have participated in Ryan's affirmative acts.

1  non-discriminatory motivation for denying Plaintiffs' request to use the double-capacity "Hispanic
2  shower": adherence to the modified program order, which required all inmates to shower on their
3  "own tier." According to the Second Amended Complaint, Smith's deposition testimony, as well as
4  Ryan's and Lyles' affidavits, at the same time Ryan made her racially-charged comments, she also
5  said she was "just following the institutional modified program." (Second Am. Compl. ¶ 23; Smith
6  Dep. at 27-28; Ryan Decl. ¶ 8; Lyles Decl. ¶ 7.) In other words, even if Plaintiffs had been Hispanic
7  instead of African-American, the undisputed evidence shows Ryan and Lyles would have required
8  Plaintiffs to shower together in the single-capacity shower on the Plaintiffs' own tier--due to Ryan's
9  and Lyles' race-neutral interpretation of the modified program order. For this reason, summary
10 judgment is also appropriate as to Plaintiffs' equal protection claims against Ryan and Lyles.

11 Moreover, even assuming *arguendo* that a reasonable jury could find that Ryan and Lyles
12 discriminated against Plaintiffs on the basis of race, such a finding would not automatically mandate
13 the conclusion that Ryan and Lyles violated Plaintiffs' equal protection rights.

14 The United States Supreme Court has long held that "[r]acial discrimination in prisons and jails
15 is unconstitutional under the Fourteenth Amendment, except for 'the necessities of prison security and
16 discipline.'" *Cruz v. Beto*, 405 U.S. 319, 321 (1972) (per curiam) (quoting *Lee v. Washington*, 390
17 U.S. 333, 334 (1968) (per curiam)). The specifics of how to weigh whether "the necessities of prison
18 security and discipline" justify racial discrimination has been an evolving area in recent years in the
19 Ninth Circuit.

20 In 2003, the Ninth Circuit held that a prison policy of using race as a factor in assigning a new
21 inmate's initial cell mate did not violate the Equal Protection Clause. *See Johnson v. State of*
22 *California*, 321 F.3d 791 (9th Cir. 2003). In so holding, the court employed the "deferential test for
23 examining the constitutional rights of prisoners" set forth in *Turner v. Safley*, 482 U.S. 78, 89 (1987).
24 *See Johnson*, 321 F.3d at 798. The Ninth Circuit summarized *Turner*:

25 According to the [Supreme] Court, '[s]ubjecting day-to-day judgments of prison
   officials to an inflexible strict scrutiny analysis would seriously hamper their ability
26 to anticipate security problems and to adopt innovative solutions to the intractable
   problems of prison administration.' Thus, 'when a prison regulation impinges on
27 inmates' constitutional rights, the regulation is valid if it is reasonably related to
   legitimate penological interests.'
28
*Johnson*, 321 F.3d at 798 (quoting *Turner*, 482 U.S. at 89.) Among other things, *Johnson* held that

1 if the plaintiff "fail[s] to refute the common-sense connection between the policy and prison violence,

2 the government [is] not required to make any evidentiary showing concerning the connection." *Id.*

3 at 803 (quotation omitted). The *Johnson* court stressed the difficult situation faced by prison

4 administrators:

> Given the admittedly high racial tensions and violence already existing within the CDC, there is clearly a common-sense connection between the use of race as the predominant factor in assigning cell mates for 60 days until it is clear how the inmate will adjust to his new environment and reducing racial violence and maintaining a safer environment. Indeed, in a previous case before us, a prisoner, alleging an Eighth Amendment violation because administrators failed to consider race when releasing inmates into the yards, argued that 'individual prison cells are segregated because it is widely understood that members of different races would attempt to kill each other solely on the basis of gang membership or race.'

10 *Id.* at 802 (quoting *Robinson v. Prunty*, 249 F.3d 862, 862 (9th Cir. 2001)).

11 However, the Supreme Court subsequently reversed the Ninth Circuit in *Johnson*, holding that,

12 even in the prison context, "*all* racial classifications imposed by government must be analyzed by a

13 reviewing court under strict scrutiny." *Johnson v. California*, 543 U.S. 499, 505 (2005) (emphasis

14 in original). The Court rejected the Ninth Circuit's use of the relaxed *Turner* standard of review for

15 racial classifications in the prison setting. *See id.* at 509-10. Instead, the Court held that "[t]he

16 necessities of prison security and discipline are a compelling government interest justifying only those

17 uses of race that are narrowly tailored to address those necessities." *Id.* at 512 (quotation omitted).

18 In this case, the record is not sufficiently developed for the Court to engage in a strict scrutiny

19 analysis with respect to Ryan's alleged action and Lyles' alleged inaction--and such an analysis would

20 be unnecessary because it is apparent that even if Ryan and Lyles committed an equal protection

21 violation on March 18, 2002, they would be shielded from liability by the doctrine of qualified

22 immunity.

23 The defense of qualified immunity shields a § 1983 defendant from trial when the defendant

24 "'reasonably misapprehends the law governing the circumstances she confronted,' even if the

25 [defendant's] conduct was constitutionally deficient." *Motley v. Parks*, 432 F.3d 1072, 1077 (9th Cir.

26 2005). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court held that even if a defendant's

27 conduct violated a constitutional right, a court must determine whether the violated right was "clearly

28 established." *See id.* "Even if the violated right is clearly established, the *Saucier* Court recognized

that it may be difficult for a police officer to determine how to apply the relevant legal doctrine to the particular circumstances he or she faces. The *Saucier* Court therefore held that if the officer makes a mistake in applying the relevant legal doctrine, he or she is not precluded from claiming qualified immunity so long as the mistake is reasonable." *Kennedy v. City of Ridgefield*, 411 F.3d 1134 (9th Cir. 2005) (internal citation omitted). In this way, the rule of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Saucier*, 533 U.S. at 202.

"The relevant, dispositive inquiry in determining whether a right is clearly established for purposes of qualified immunity is whether it would be clear to a reasonable state official that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. If the law did not put the official on notice "that his conduct would be clearly unlawful," the official is entitled to qualified immunity. *See id.* In the instant case, Ryan and Lyles argue that on March 18, 2002, it would not have been clear to a reasonable prison official that it would be unconstitutional to adhere to the prisoner-instituted racial classification of showers during a temporary lockdown situation. As noted above, at that time, race-based classifications of inmates only had to be "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see also Johnson*, 321 F.3d at 799. Consequently, in the instant case, to satisfy the "clearly established" prong of the qualified immunity analysis, Defendants have to show that a prison official could have reasonably believed, under the circumstances, that refusing to comply with Plaintiffs' request to shower in the upper-tier Section B
shower was reasonably related to a legitimate penological interest.

Defendants have made such a showing. In *Johnson*, when the Ninth Circuit upheld the race-based classification under the *Turner* standard, the court emphasized that the racial classification passed constitutional muster in part because it was only temporary. *See id.* at 797, 799. Similarly, in this case, the undisputed evidence shows that corrections officers did not adhere to the racial classification of showers, outside of the nine-day modified program (indeed, outside of a single incident on a single day during the modified program). Further, the evidence from Plaintiffs, as well as from Ryan and Lyles, indicated that an inmate using a shower designated for another racial group

would be subject to retribution. (Jackson Dep. at 68-76; Ryan Decl. ¶ 7; Lyles Decl. ¶ 6.) A corrections officer could reasonably believe that the possibility of violent retribution would be heightened in the immediate aftermath of the prior security incident which resulted in the temporary modified program. *Cf. Walker v. Gomez*, 370 F.3d 969, 973 (9th Cir. 2004) ("[I]t has not been clearly established that ... race-based differentiation [in the assignment of prison jobs] is unconstitutional in the context of a prison-wide lockdown instituted in response to gang-or race-based violence."). Indeed, less than a year prior to the incident at issue, the Ninth Circuit *denied* qualified immunity to prison officials because they *refused* to racially segregate the exercise yard when the officials had reason to believe that racially-charged violence might result. *See Robinson v. Prunty*, 249 F.3d 862, 867 (9th Cir. 2001) ("[Plaintiff]'s evidence paints a gladiator-like scenario, in which prison guards are aware that placing inmates of different races in the yard at the same time presents a serious risk of violent outbreaks.... [I]f [plaintiff]'s gladiator-like scenario is true, then no reasonable prison official could have believed that his or her conduct was lawful."). The Court finds, as a matter of law, that even if Ryan and Lyles discriminated against Plaintiffs on the basis of their race, Ryan and Lyles are shielded from liability by qualified immunity.[4]

### B. Due Process Claims

Prisoners may claim the protections of the Due Process Clause, and may not be deprived of life, liberty or property without due process of law. *See Wolff v. McDonnell*, 418 U.S. 539, 564-71 (1974). However, the prisoner must identify a constitutionally protected liberty interest. *See Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003). In the prison context, [t]hese ... [due process] procedural protections, ... adhere only when the disciplinary action implicates a protected liberty interest in some 'unexpected matter' or imposes an 'atypical and significant hardship on the inmate

---

[4] Qualified immunity does not shield officials from claims for injunctive relief. *See Walker v. Gomez*, 370 F.3d 969, 978 (9th Cir. 2004). Although Plaintiffs' Second Amended Complaint seeks injunctive relief, the evidence shows it is not available as a matter of law. A plaintiff seeking injunctive relief must demonstrate "a sufficient likelihood that he will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Here, as discussed *supra*, there is insufficient evidence to show an official policy of racially segregating the showers at Centinela. Furthermore, since the filing of the Complaint, Jackson has been transferred to a different prison (Jackson Dep. at 21), and Smith has been moved to a lower security level, where he is free to chose his shower even during modified programs (Smith Dep. at 18). There is no likelihood that Ryan would have the opportunity to again wrong Plaintiffs in the manner alleged. (Lyles, meanwhile, is no longer employed by the Department of Corrections. (Lyles Decl. ¶ 1.))

1  in relation to the ordinary incidents of prison life.'" *Id.* (quoting *Sandin v. Connor*, 515 U.S. 472, 484
2  (1995); citing *Ramirez v. Galaza*, 334 F.3d 850, 860 (2003) ("If the hardship is sufficiently significant,
3  then the court must determine whether the procedures used to deprive that liberty satisfied Due
4  Process.")). The Supreme Court has identified few protected liberty interests. *See, e.g.*, *Washington*
5  *v. Harper*, 494 U.S. 210, 221-22 (1990) (identifying the freedom from the involuntary administration
6  of psychotropic drugs as a protected liberty interest); *Vitek v. Jones*, 445 U.S. 480, 493 (1980)
7  (identifying the freedom from transfer to a mental hospital as a protected liberty interest).

8  Smith testified that the March 12, 2002 incident resulted in verbal taunts from other inmates
9  and insinuations of a homosexual relationship between Plaintiffs. (Smith Dep. at 84-86.) He said that
10 among the African-American inmates, "it was the joke of the month." (*Id.* at 85-86.) Similarly,
11 Jackson testified that the incident made him be perceived as weak among the prison community.
12 (Jackson Dep. at 120.)

13 These results cannot be said to impose an "atypical and significant hardship on the inmate in
14 relation to the ordinary incidents of prison life." *Serrano*, 345 F.3d at 1078. As the Ninth Circuit has
15 remarked: "We are mindful of the realities of prison life, and while we do not approve, we are fully
16 aware that the exchange of verbal insults between inmates and guards is a constant, daily ritual
17 observed in this nation's prisons." *Somers v. Thurman*, 109 F.3d 614, 622 (9th Cir. 1997) (quotation
18 omitted). In short, "verbal harassment or abuse ... is not sufficient to state a constitutional deprivation
19 under 42 U.S.C. § 1983." *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (quotation
20 omitted). Therefore, Plaintiffs' due process claims must fail as a matter of law.

21 **IV.    Conclusion**

22 It is hereby **ORDERED** that the Report and Recommendation (D.E. # 78) is **ADOPTED** in
23 full. Defendants' Motion for Summary Judgment (D.E. # 64) as to all of Plaintiffs' remaining claims
24 is **GRANTED**. The Clerk of the Court shall enter judgment in favor of Defendants.

25 DATED: February 1, 2007

*William Q. Hayes*
**WILLIAM Q. HAYES**
United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28